IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

_____

| | |
|---|---|
| AYLA HAEBERLI, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) Civil Action No: |
| STATE OF FLORIDA | ) |
| And | ) |
| JUDGE LISA MUNYON, in her | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE DIANA TENNIS, in her | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE JOSHUA MIZE, in his | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE MICHAEL MURPHY, in his | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE ELIZABETH GIBSON, in her | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE CRAIG MCCARTHY, in his | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE HEATHER HIGBEE, in her | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE MIKAELA NIX-WALKER, in her | ) |
| individual and official capacities; | ) |
| and | ) |
| JUDGE ROBERT LEBLANC, in his | ) |

```
individual and official capacities;        )
and                                         )
PETER HAEBERLI;                             )
And                                         )
LOWNDES, DROSDICK, DOSTER                   )
KANTOR & REED, P.A.;                        )
And                                         )
DERREN CIAGLIA;                             )
And                                         )
TERRY YOUNG;                                )
And                                         )
MELODY LYNCH;                               )
And                                         )
RICHARD DELLINGER;                          )
And                                         )
KENNETH D MORSE P.A.;                       )
And                                         )
KENNETH D MORSE;                            )
And                                         )
MARTIN PEDATA;                              )
And                                         )
MARION FRICKER;                             )
        Defendants.                         )
_____/
```

<u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

<u>AND DAMAGES AND DEMAND FOR JURY TRIAL</u>

Plaintiff Ayla Haeberli ("Plaintiff"), proceeding pro se, brings this civil rights

action pursuant to 42 U.S.C. § 1983, § 1985, and Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., for violations of her

constitutional rights to due process and access to the courts and demand for Jury

Trial pursuant to Fed. R. Civ. P. 38(b), and alleges as follows:

PRELIMINARY STATEMENT

1. This action arises from the systematic denial of meaningful access to courts and medical care for Plaintiff's disabled dependent adult son through the coordinated actions of state and private actors. The defendants have engaged in a persistent pattern of conduct that has effectively barred Plaintiff from obtaining emergency relief for critical medical needs while facilitating the fraudulent concealment of assets needed for dependent care, enforcement and modification of the Final Judgment.

JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to: a. 28 U.S.C. § 1331 (federal question jurisdiction); b. 28 U.S.C. § 1343(a)(3) (civil rights jurisdiction); c. 42 U.S.C. § 12133 (ADA jurisdiction); and d. 28 U.S.C. §§ 2201 and 2202 (declaratory judgment jurisdiction).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as the events giving rise to these claims occurred within the Middle District of Florida.

RELATED FEDERAL PROCEEDINGS

4.  A related action concerning Medicaid and healthcare access for Plaintiff's disabled dependent son is currently pending in this Court, Case No. 6:24-cv-01987- WWB-RMN ("the Medicaid Action").

5.  While both actions involve aspects of medical care access for Plaintiff's dependent son, they present distinct claims: a. The Medicaid Action challenges: i. Denial of access to necessary medical services through Providers/Sunshine/Centene; ii. Failure to provide adequate healthcare coverage; iii. Violations of Medicaid regulations and requirements. b. This action challenges: i. Denial of access to state courts for emergency medical care hearings; ii. Systematic obstruction of judicial remedies for medical care funding; iii. Conspiracy to prevent enforcement of support obligations for medical care.

6.  These actions are complementary rather than duplicative because: a. They involve different defendants and distinct conduct; b. The Medicaid Action addresses direct healthcare service provision, while this action addresses judicial access to enforce private medical care obligations; c. Different

federal rights and remedies are at issue in each case; d. Resolution of one

action will not fully address the harm alleged in the other.

SOVEREIGN IMMUNITY EXCEPTIONS

7.  The State of Florida's sovereign immunity does not bar these claims

because: a. The systematic denial of emergency medical care for a disabled

dependent adult constitutes deliberate indifference rising to the level of a

constitutional violation; b. The continuing pattern of denying access to

emergency hearings regarding medical care demonstrates an official policy

or custom of discrimination against disabled persons in violation of Title II

of the ADA; c. The State's implementation of Administrative Rule 2014-19

effectively bars meaningful access to courts for emergency medical care in

violation of fundamental constitutional rights; d. The State's systematic

failure to enforce the Final Judgment's requirements regarding dependent

care needs represents an ongoing violation of federal law; e. The

coordinated conduct between state actors evidences a policy of denying

constitutional rights that overcomes sovereign immunity; f. The State's

actions constitute an ongoing violation of Title II of the ADA, for which

Congress has validly abrogated state sovereign immunity.

YOUNGER ABSTENTION INAPPLICABILITY

8.   The Younger abstention doctrine does not bar this Court's jurisdiction

because:

a. The coordinated conduct between state judicial officers and private

parties demonstrates bad faith in the administration of state judicial

proceedings;

b. The deliberate denial of medical care resources to a disabled dependent

adult constitutes extraordinary circumstances involving irreparable injury;

C. The deliberate denial of enforcement of court orders constitutes

extraordinary circumstances involving loss of property and liberty without

due process;

d. The systematic bias and coordination between state actors and private

parties renders state court proceedings inadequate to protect federal

constitutional rights;

e. The conspiracy to fraudulently transfer and conceal assets presents

independent federal questions beyond the scope of normal domestic

relations proceedings.

STATUTE OF LIMITATIONS

9. The claims in this action are timely filed. While federal civil rights claims generally carry shorter limitation periods, the underlying fraud that forms the basis of this conspiracy continues to the present day and includes: a. Ongoing filing of false financial affidavits from 2011 to present; b. Active concealment of assets through 2024; c. Continuing denial of access to court hearings through 2024.

10. The fraud underlying these claims remains actionable in Florida state court under Florida Family Law Rule 12.540, which places no time limitation on seeking relief from fraudulent financial affidavits in family law proceedings.

11. The continuing violations doctrine applies to these claims as Defendants' conduct represents an ongoing pattern of constitutional violations that continues through the present day.

PARTIES

12. Plaintiff Ayla Haeberli is a resident of Volusia County, Florida and the mother and legal guardian of a disabled dependent adult son who requires continuous medical care and supervision.

13. Defendant State of Florida is a sovereign state of the United States that operates and maintains the court system within which the constitutional violations occurred. The State of Florida, through its judicial system and administrative procedures, has engaged in a pattern and practice of denying access to courts and emergency medical care in violation of Title II of the ADA and the U.S. Constitution.

14. The following defendants are Circuit Court Judges of the Ninth Judicial Circuit Court of Florida, who at all relevant times were acting under color of state law. Each is sued in their individual capacity for non-judicial administrative acts and actions exceeding their lawful authority, and in their official capacity for declaratory and injunctive relief only: a. Defendant Judge Lisa T. Munyon; b. Defendant Judge Diana M. Tennis; c. Defendant Judge Elizabeth A. Gibson; d. Defendant Judge Craig McCarthy; e. Defendant Judge Heather Higbee; f. Defendant Judge Mikaela Nix-Walker; Judge Michael Murphy, Defendant Former Judge

Robert LeBlanc, who at times relevant to this action was serving a circuit Court Judge of the Ninth Judicial Circuit Court; and Judge Joshua Mize, currently serving as a Judge of the Sixth District Court of Appeal, who at times relevant to this action was serving as a circuit Court Judge of the Ninth Judicial Circuit Court.

15. Defendant Peter Haeberli is an attorney licensed to practice law in Colorado and Plaintiff's former husband. At all relevant times, he has engaged in systematic fraud and conspiracy to avoid support obligations by: (a) filing false financial affidavits with the Florida courts concealing approximately $18 million in income; (b) orchestrating a sham divorce proceeding in New Jersey to fraudulently transfer assets; (c) deliberately terminating employment to deprive his disabled dependent son of medical insurance coverage; (d) intercepting and misappropriating insurance reimbursement checks meant for the dependent's medical care; and (e) engaging in discriminatory treatment between his children by providing private education, therapy, and healthcare for his other children while insisting his disabled son rely solely on public assistance..

16. Defendant Kenneth D Morse P.A. is a Florida professional association that represented Plaintiff from March 2020 through October 2022. While acting under color of state law through its employee Kenneth Morse, the firm

effectively denied Plaintiff meaningful access to courts through coordination with state actors and systematic failure to pursue discovery or enforcement of court orders. Defendant Kenneth Morse is an attorney licensed to practice law in Florida who is sued in his individual capacity. While acting under color of state law, he effectively denied Plaintiff meaningful access to courts through: (a) failure to pursue discovery of fraudulent financial affidavits despite clear evidence; (b) failure to issue requested subpoenas or conduct meaningful discovery; (c) allowing nine months to pass before obtaining a hearing date on Plaintiff's emergency motion, then failing to provide opposing counsel with required evidence, forcing Plaintiff to withdraw the emergency motion due to lack of evidence, an effective denial of emergency relief; and (d) withholding client documents after termination until after discovery deadlines had passed, preventing Plaintiff from timely seeking discovery.

17. Defendant Martin Pedata is an attorney licensed to practice law in Florida who is sued in his individual capacity. While acting under color of state law, he denied plaintiff meaningful access to courts through: (a) not providing evidence timely for emergency hearing, (b) failing to use financial affidavits showing dissipation of large sums of assets causing a denial of an emergency motion required to provide care for the dependent,

(c) did not pursue discovery and (d) did not retrieve documents from prior attorney until after discovery deadlines had passed.

18. Defendants Lowndes, Drosdick, Doster, Kantor & Reed, P.A. ("Lowndes Law Firm"), and its attorneys Richard Dellinger, Derren Ciaglia, Terry Young, and Melody Lynch (collectively "Lowndes Defendants") are licensed to practice law in Florida and at all relevant times to this action represented Peter Haeberli. The Lowndes Defendants acted under color of state law through their joint participation with state judicial officers in a conspiracy to deny court access and conceal assets by: (a) coordinating with judicial defendants to prevent emergency hearings and discovery; (b) participating with state actors in implementing discriminatory scheduling practices; (c) working in concert with judicial defendants to shield fraudulent financial affidavits from discovery; (d) collaborating with state officers to obstruct enforcement of support obligations; and (e) conspiring with judicial defendants to systematically deny due process and meaningful access to courts.

19. Defendant Magistrate Ison was acting under color of state law as a General Magistrate of the Ninth Judicial Circuit Court of Florida, exercising state-delegated authority over family court matters. She is sued in her individual capacity for non-judicial administrative acts and actions

exceeding her lawful authority, and in her official capacity for declaratory and injunctive relief only. While acting in her official capacity and wielding state judicial power, Magistrate Ison: (a) ruled on contested matters including a Motion for Rehearing less than one business day before trial without allowing testimony; (b) canceled previously ordered trials in violation of sitting judges' orders of September 22, 2017 and November 12, 2014; (c) failed to enforce mandatory disclosure requirements despite having ordered such disclosure on January 19, 2017; and (d) demonstrated such systematic bias that Plaintiff was forced to file a Motion to Disqualify on December 18, 2017. These actions were taken under authority granted by the State of Florida and resulted in the denial of Plaintiff's constitutional rights to meaningful hearings and due process.

20. Defendant Marion Fricker, who is sued in her individual capacity, is Peter Haeberli's second wife who acted under color of state law by conspiring with state actors to shield assets from the Florida courts' jurisdiction. She knowingly participated in: (a) a coordinated scheme to conceal several million dollars in assets that should have been available for the dependent's medical care; (b) orchestrating a sham divorce proceeding in New Jersey designed to fraudulently transfer assets and avoid Florida court jurisdiction; (c) accepting fraudulent transfers of assets while

knowing of Peter Haeberli's support obligations; and (d) participating in a scheme that deliberately deprived a disabled dependent of necessary medical care resources while maintaining a lavish lifestyle including a million-dollar home purchased with concealed assets. Defendant Marion Fricker is Peter Haeberli's second wife who participated in the conspiracy to shield assets from the Florida courts.

FACTUAL ALLEGATIONS

21. In 2008, Plaintiff and Defendant Peter Haeberli entered into a Marital Settlement Agreement as part of their divorce proceedings in Orange County case number 2006-DR-19002.

22. The Agreement provided for support for the parties' disabled dependent son and allowed for modification of child support and/or alimony based on increased costs and/or care needs and ability to pay.  The Final Judgment specifically determined that child support was to be calculated based on income from all sources which specifically included bonuses and exercised options.

23. In 2011, Plaintiff filed a supplemental petition seeking modification due to increased needs of the dependent son, alimony and enforcement.

24. Over the subsequent 14 years, through a coordinated pattern of conduct, Defendants systematically prevented Plaintiff from having meaningful hearings on her motions through the following acts: a. Judges repeatedly denied or failed to schedule emergency motions regarding medical care needs; b. Judges systematically ruled on substantive motions without evidentiary hearings; c. The court implemented and enforced Administrative Rule 2014-19 in a manner that effectively denied access to hearings; d. Judges failed to enforce discovery obligations against Defendant Peter Haeberli; e. Judge created orders that denied enforcement of prior court orders that prejudiced the Plaintiff, f. Plaintiff's retained counsel failed to properly pursue discovery or present evidence; g. Defendant Peter Haeberli engaged in asset dissipation and discovery evasion; h. Defendants Peter Haeberli's retained counsel knowingly assisted in concealing asset dissipation and filing false financial affidavits, and; i. Judges demonstrated consistent bias against Plaintiff as a pro se litigant.

25. The judicial defendants engaged in conduct exceeding their protected judicial functions through a coordinated pattern of non-judicial administrative acts, actions exceeding lawful authority, extra-judicial conduct, and abuse of judicial power. Their non-judicial administrative

acts included implementation of discriminatory scheduling policies, creation of systematic barriers to emergency hearings, and use of Administrative Rule 2014-19 to deny meaningful court access. They exceeded their lawful authority by systematically denying emergency medical motions without hearing, refusing to enforce valid court orders, and imposing arbitrary restrictions on access to judicial process. The judicial defendants further engaged in extra-judicial conduct by coordinating with other defendants to prevent discovery, participating in concealment of fraudulent conduct, and implementing retaliatory procedures against pro se litigants. These defendants abused their judicial power through deliberate indifference to medical emergencies, systematic bias against pro se litigants, and a persistent pattern of denying constitutionally required hearings. The attorneys knowingly facilitated and participated in concealing asset dissipation, filing false financial affidavits, and participating in a conspiracy to shield assets from the court's jurisdiction. This conduct was undertaken with knowledge of and deliberate indifference to the harm it would cause to Plaintiff and her disabled dependent son, and was carried out in furtherance of the broader conspiracy to deny meaningful access to judicial remedies.

26. In 2012, Judge Shea ruled on temporary attorney fees that were not enforceable until after trial in 2018 due to a) a failure of Plantiff's attorney to timely issue order until 7/14/14 and b) a denial of court access to enforce order.

27. In 2013 and 2014, Judge Leblanc denied Petitioner due process and meaningful access to the court through the following acts: Judge Leblanc would not enforce any of his court orders with consequence for the defendant's portion of medical expenses for the medically fragile child; b) Judge Leblanc caused Petitioner increased legal expenses; c) denied legal and expert witness expenses prohibiting future representation and penalizing Petitioner, a non-attorney; d) Judge Leblanc would not cause Peter Haeberli, defendant, to show up for evidentiary/contempt hearings, e) Judge Leblanc failed to enforce discovery/mandatory disclosure; f) Judge Leblanc ordered on motions without proper notice; g) Judge Leblanc ruled against plaintiff despite clear evidence of perjury, h) Judge Leblanc did not write orders that were legally sufficient thereby denying plaintiff access to relief on appeal, I) Judge Leblanc engaged in perjury, J) Judge Leblanc threatened Plaintiff by considering relocating medically fragile dependent to New Jersey and institutionalization, k) Judge Leblanc issued an order to show cause for failure to comply with the Income Withholding

Order threatening a writ of bodily attachment and L) Plaintiff was denied

any hearing on the order because the court then issued an order of recusal.

Specific examples are evidenced and not limited to the following:

1. On July 22, 2013, the Judge awarded plaintiff medical expenses that
   took three hearings and 6 months to pay only to have Peter Haeberli
   stop paying support all together.  The Judge refused to implement
   any consequence for a failure to comply with his court orders.

2. On March 3, 2014,  the Judge did issue an Income Withholding
   Order, IWO, that did not include any arrearage.

3. On April 15, 2014, the Judge failed to provide proper notice for
   hearings and proper orders for motions the judge chose to hear
   during the hearing.  The Judge did not rule on a motion for
   telephonic appearance that had been objected to.  The Judge failed to
   write any factual findings on his order.  The Judge chose to hear
   three motions for contempt (filed March 24, 2014, April 2, 2014 and
   April 10, 2014) when only one had been noticed for hearing.  And
   the Judge failed to rule on the only motion that had actually been
   noticed for hearing (filed March 24,2014).  The order was held up in

the appellate court for 10 months before rendering a reverse and remand on 2/13/2015 (case no. 5D14-1727).

4.  The Judge refused to enforce contempt orders or implement consequences against Former Husband for non-payment.  During hearings, the Judge stated that "no one would go to jail" ( July 22, 2013 and November 4, 2014 hearings) and despite Peter Haeberli had additionally evaded subpoena for the  9/30/13 hearing.

5.  On November 4, 2014, the Judge denied the Former Wife legal fees despite evidence of Former Husband's significant income ($500,000+ in 2013) and gave an additional 90 days to pay the ordered medical expenses from the July 22, 2013 hearing.  This denial denied equal access by requiring Former Wife to represent herself against an attorney. Additionally during prior hearings the  (January 14, 2014 and April 21, 2014), the plaintiff was denied legal expenses.

6.  Engaged in ex parte communications;  the Judge had mentioned institutionalization several times in court which had been the Former Husbands desire and to remove the child to New Jersey. The Judge made several statements in Court which required knowledge not obtained infront of the plaintiff.

7. In all hearings Peter Haeberli pleaded poor. The Judge did not properly consider evidence of Former Husband's actual income when ruling on enforcement matters. During the hearings, Peter Haeberli testified that he was on a fixed income of $300,000 annually, yet his income always included a bonus and in 2013 he had made over $500,000.

8. The Judge denied attorney fees, stated that there was no money for expert witnesses or deposition while knowing that Peter Haeberli was avoiding discovery, committing perjury, and filing false affidavits during a 4/21/2014 hearing.

9. On 5/8/2014, Judge Leblanc wrote an Order to Show Cause stating "FAILURE TO APPEAR AT THE HEARING MAY RESULT IN THE COURT ISSUING A WRIT OF BODILY ATTACHMENT FOR YOUR ARREST. IF YOU ARE ARRESTED YOU MAY BE HELD IN JAIL UP TO 48 HOURS BEFORE A HEARING IS HELD. The hearing was scheduled for June 6, 2014 at 9:30am. On 5/22/14 there was a balance due of $25,800 from the clerk of court. On May 29,2014, the court, on its own motion entered its order of recusal requesting a transfer. The hearing of June 6, 2014 threatening consequence "writ of bodily attachment" against Peter Haeberli was then cancelled.

28. During the November 4, 2013 hearing, Peter Haeberli was represented by Kristopher Kest, an attorney from the Lowndes, Drosdick, Doster, Kantor and Reed, PA law firm, who filed a motion, FORMER HUSBAND'S MOTION FOR LEAVE TO CLARIFY TESTIMONY. It requested leave to clarify testimony he provided at the hearing of 11/4/13 hearing. Peter Haeberli did not provide an honest financial affidavit. Mr Kest filed a motion to withdraw on 11/21/13. There was no consequence for Peter Haeberli from the hearing, the outstanding order of August 2, 2013 (owing $9,283.38) had an additional deadline of 90 days to pay and the Plaintiff was further penalized by a denial of attorney fees.

29. In 2014, Judge Higbee denied due process and meaningful access to the Court through the following acts: a) Reversed emergency motion for child's medication without proper hearing; b) Made concerning ruling (filed 6/24/14) that a child has to go without [lifesaving] medication in order for it to be considered an emergency; c) Found Former Husband in "substantial compliance" despite evidence of non-payment; d) Failed to enforce Writ of Bodily Attachment despite clear non-compliance; e) Used interim orders to effectively block enforcement of support orders and rendered the Final Judgment unenforceable.

Specific examples are evidences, and not limited to the following:

1. Denial of Leblanc's court order of 5/25/14 for medication payment ordered by Judge Higbee on 6/20/14 when Peter Haeberli was able to show up telephonically for Plaintiff's Motion for Contempt.

2. On September 22, 2014, Peter Haeberli was found to be in willful indirect civil contempt and owed $21,463.25 in child support and alimony. While he claimed that $12,463 was already directed by his employer to satisfy part of the support owed, he was directed to pay $8,547.20 within thirty days or there would be a writ of bodily attachment issued by the court. The Former Husband did not pay any part of the $8,547.20 he was ordered to pay, yet the Court in a subsequent Interim Order filed on 11/12/2014 denied the motion for issuance of a writ due to substantial compliance with the 9/23/14 order. There was no consequence for contempt.

3. Plaintiff showed up for a contempt hearing on 11/12/14 and was not allowed into the court room for hearing. Peter Haeberli did not show up and was granted his notice of unavailability which she granted on the same day 11/12/14 in her interim order. The Judge issued an interim order that denied access to the court for contempt or enforcement matters until trial.

4.  The Court in its interim order required parties to adhere to the administrative orders for future pleadings, for example Administrative Rule 2014-19.

5.  The Court reserved jurisdiction to prohibit the filing of future pleadings without attorney certification and, in the same order, denied the Plaintiff's motion for attorney fees.

30. In 2015 through 2017, Judge Murphy denied due process and meaningful access to the court through the following acts:

1.  On 1/21/15, Judge Murphy denied Plaintiff's motion to retain the prior Judge Higbee so that this case could get to trial.

2.  Judge Murphy continued the pattern of denying Plaintiff's emergency motions so that the dependent could have access to medical care as evidenced on the 1/11/16, 1/13/16 and 1/15/16 orders.

3.  On January 26, 2015, during a status hearing, Plaintiff told the judge that she wanted a real Judge to hear the case. Yet the case was referred to the magistrate.

4.  On 3/14/16, Judge Murphy ordered that if alimony went up then child support must go down so that there is no net change in total

support.  This essentially renders the Final Judgment unenforceable as to any modification for increased needs and increased ability to pay.  It prejudiced against the Plaintiff and rewarded Peter Haeberli who had been found to be in contempt over and again.  It denied any relief to additional cost to a medically fragile dependent.

5. On 1/26/17, the Plaintiff filed a VERIFIED EMERGENCY MOTION FOR IMMEDIATE ORDER TO ALLOW INSURANCE REIMBURSEMENT TO FOR MEDICATION REQUIRED FOR A CHILD'S LIFE TO BE ADJUDICATED WITHIN THREE DAYS BY January 31, 2017.  Peter Haeberli had been denying the dependent access to his medical benefits by changing the alternate address and taking the reimbursement for medicine paid for by the Plaintiff.  On 1/27/17, Judge Murphy threatened in an order to show cause why the father should not assume temporary residential custody of the minor child pending final hearing.  There was no way to get a fair hearing or any relief from the Court and the Court acted unlawfully to threaten the very life of the dependent by threatening to send a medically fragile to his estranged father and  denying relief for over 5 years.

6.  The Judge through his Judicial Assistant denied Plaintiff access to the court.

31. In 2015 through 2017, Breanne Greene, Judicial Assistant for Judge Murphy, denied due process and access to the court. While the Plaintiff had requested four times for coordinating hearing with Peter Haeberli, she would not schedule hearing (evidenced by 4/17/15 email string) all the while claiming that after three different requests Plaintiff could then have the time of her choosing. As evidenced through numerous emails Ms Greene would not provide any requested 2 hour hearing time slots for her motion to be heard infront of Judge Murphy and was limiting Plaintiff meaningful access to the court by only supplying 30 minute hearing (email 4/22/2015 among others). After informing the JA about compliance with Administrative Order 2014- 19 regarding an emergency motion for medical reimbursement filed 3/10/16 and verified motion for Rule to show cause filed 5/7/2015 (evidenced by email on 12/19/2016 and 12/28/2016) and sent numerous emails for hearing timeslots, Ms Greene would not respond to the plaintiff's request until an email written to the chief Judge Lauten (evidenced by email 1/3/2017 string) and copied to all parties. Ms Green then only advised that Plaintiff was not being ignored and the Plaintiff was not to copy Chief Judge Lauten's JA, yet the

24

statement was made still without providing access to a hearing. Ms Greene also was not timely referring Plaintiffs referral to the magistrate so that the plaintiff could object and set the motion for hearing which was denying due process. Plaintiff was being barred from having hearing times, for example when requesting hearing times as soon as possible, Ms Greene responded "… there are no available dates/times within the time frame you are requesting."(email of 9/28/2017, 9/29/2017 among others). After 5 requests for hearing times for Plaintiffs change of venue motion, Ms Green offered times for a hearing date after the scheduled trial in this case (October 4, 2017).

32. In 2015 through 2017, Magistrate Ison presided over the case and this denied Plaintiff access to the court as follows: a. On December 8, 2017, Magistrate Ison ruled on a contested Motion for Rehearing less than one business day before trial without allowing testimony and to Plaintiff's detriment; b. Magistrate Ison repeatedly canceled trials without proper authority, violating sitting judges' orders 9/22/27 for trial to proceed (9/22/27 and 11/12/14);c. Magistrate Ison failed to enforce discovery obligations against Defendant Peter Haeberli despite having previously ordered him to provide mandatory disclosure (ordered 1/19/2017); d. 0n

12/18/2017, Plaintiff filed a Motion to Disqualify Magistrate Ison due to demonstrated bias and systematic denial of access to hearings.

33. In 2016, The plaintiff was caused to sell her modest home in Winter Park to pay off debt. A home she had paid off and owned outright pursuant to the parties Final Judgment in 2008. The Plaintiff and dependent were caused to move to a rental property in her parent's backyard.

34. Judge Tennis then presided over the case until a trial in 2018. In June and July of 2018 this case came to trial and the resulting support obligations were based on false financial affidavits from Peter Haeberli. In the trial proceeding in July, the Judge allowed Peter Haeberli to show up telephonically when the Plaintiff objected. As seen from the Supplemental Final Judgment, there was no consequence for Peter Haeberli having denied dependent access to his medical benefits since 2015. There was no consequence for Peter Haeberli having been in contempt for unpaid support since 2014. There was no consequence for owing support through the IWO other than making it current. There was no consequence for Peter Haeberli not informing the Court Clerk of his payment schedule. There was no consequence for dissipation of assets (purchase of a million-dollar home and hiding assets in his wife's account). The Plaintiff's Rule to Show Cause for unpaid support that had not been included in the Income

withholding order was denied. The Judge said that this case having taken

so long, we will just never know. The Judge did not comply with the

original Final Judgment and Marital Settlement agreement requiring child

support to be modified in 2011 and would not consider retroactive support

back to 2011. The Judge claimed that alimony was capped by his income;

income derived by false financial affidavits. The Plaintiffs actual attorney

fees were not considered due to an inability to pay which violated the

terms of the MSA and Final Judgment (2008). The Judge did grant a

nominal $10,000 of temporary attorney fees from a hearing in 2013 for

which Peter Haeberli was held in contempt again without consequence

and she placed it into arrearage on the IWO.

35. In 2019, Judge Tennis denied a MOTION FOR RELIEF FROM JUDGMENT
    AND FOR DAMAGES filed on 7/18/19 claiming that there was no factual
    allegations or legal basis for the court to reopen the Final Judgment order
    filed 7/26/19 and adjudicated from chambers without scheduling an
    evidentiary hearing. Yet, the Plaintiff, among other things, identified the
    false financial affidavits and the exact referenced proof. Judge tennis
    apparently required evidence without an evidentiary hearing.

36. In 2020, Judge Tennis presided over another supplemental petition. On
    2/10/21, she granted a motion that allowed Peter Haeberli to subpoena

every medical professional that the dependent ever had for all medical

information when the Plaintiff objected and filed a Motion for Protective

Order.  All of the dependents medical practitioners were subpoenaed.

When a practitioner is being subpoenaed for all records of a severely

handicapped individual by a family court it necessarily prejudices the

Plaintiff, the dependents mother and legal guardian causing unwarranted

shame.

37. Judge Tennis also granted Peter Haeberli's motion have a

neuropsychological evaluation of the Dependent on 2/15/21.  The report

was not provided to the Plaintiff until 12/19/2022 and was substantially

flawed.

38. In January 2021, the LOWNDES, DROSDICK, DOSTER, KANTOR &

REED, P.A law firm again represented Peter Haeberli.  Through his

counsel Richard Dellinger, on 3/10/21, Peter Haeberli filed yet another

fraudulent financial affidavit.

39. In 2021 and 2022, Judge Mize presided over the case.   On 10/14/2021 the

Judge denied Peter Haeberli's Motion for Summary Judgment by

acknowledging the $11,000,000 payment the prior year as a substantial

change.  On 1/24/22, during a case management conference hearing, the

Judge learned that Peter Haeberli was engaging in a divorce with his

second wife and stated that it could result in a decrease in his support obligations. The Judge stated during that same hearing that the Plantiff's emergency motion could be scheduled to be heard and that the JA was to send out potential dates/times to Counsel for a 90 minute hearing. It took 9 months to have a hearing time for Plaintiff's emergency motion (filed 1/20/22) with a hearing date of September 27, 2022.

40. Plaintiff was represented by Mr Morse from March 2020 through 10/25/22 when he was fired. On September 27, 2022, he did not provide opposing counsel with exhibits timely and there was scant relevant evidence to use for the hearing on FORMER WIFE'S EMERGENCY MOTION FOR ADDITIONAL FINANCIAL ASSISTANCE FROM FORMER HUSBAND TO PROVIDE MEDICAL CARE FOR CHILD AND FOR ADDITIONAL ATTORNEY'S FEES filed on 1/20/22; Mr Morse was prepared to present his own attorney fees. Plaintiff withdrew the motion. Mr Morse did not pursue any subpoenas which Plaintiff requested, did not pursue any false financial affidavits and he did not compel Peter Haeberli to comply with mandatory disclosure requirements. He offered no guidance on the pending divorce of Peter Haeberli's second marriage. The increasing mistrust toward Mr Morse and Opposing Counsels relationship causing the Plaintiff to prohibit him from having interactions without her presence.

The Plaintiff did not receive any relief, yet Mr Morse was granted over 27 thousand dollars from Peter Haeberli to pay for his services.  The Plaintiff also paid him over 13 thousand dollars.  After he was fired Mr Morse would not give Plaintiff her documents back, including but not limited to, mandatory disclosure/discovery documents until after the deadline to seek discovery.  Mr Morse had filed on 11/2/22 NOTICE OF CHARGING LIEN OF KENNETH C. MORSE, ESQUIRE AND KENNETH D. MORSE, P.A. against the Plaintiff requesting an additional $16,541.17.   Plaintiff objected and informed the court that Mr Morse was restricting access to her documents on by filing on 11/28/22 a VERIFIED MOTION TO SET ASIDE CHARGING LIEN FILED11/2/22 AND MOTION TO CAUSE ATTORNEY MORSE TO PROVIDE AYLA HAEBERLI ALL DOCUMENTATION IN HIS POSSESSION IN ANY WAY CONNECTED TO THIS CASE.    The court would not schedule the motion for hearing.

41. After Plaintiff fired Mr Morse, she went to the court to file, on November 28,2022, a Temporary Restraining Order and Preliminary Injunction to stop Peter Haeberli from dissipating his assets in the divorce.  She was told that it would be adjudicated in 2-3 days.  The court took no action. Plaintiff called Judge Mize's JA without response.  She emailed the Court on 12/8/2022 without any response.

42. The plaintiff received a neuropsychological evaluation report on 12/19/2022.  The report was based on an evaluation of the dependent on 1/20/2022.  The evaluation pursuant to Peter Haeberli's motion was granted by Judge Tennis on 2/15/21.  A joint stipulation agreed to between both parties was filed on 4/13/21 which cause additional cost to plaintiff who had hired a second attorney, Sherrille D. Akin, to represent her entity as a guardian.  The Report that took 11 months to write, was non-compliant with the Joint stipulation by, among other things, reporting that the dependent, a 21 year old man, would benefit for attending public school, discussed Peter Haeberli's neuropsychological evaluation, did not provide a video of the respondents home, nominalized the dependent's condition, nominalized the needs/property destruction of the home (that was/is without substantial flooring, doors, baseboards), denying access to care based on the fact that he has insurance (who was not/is not providing care) and interviewed a doctor who had never seen the dependent.  Peter Haeberli and his counsel from the Lowndes Law Firm (Melody Lynch, Terry Young and Derren Ciaglia) manipulated/manufactured evidence and did not comply with the joint stipulation.  They also violated the adult Dependent's federally protected HIPPA rights by consulting with a

medical practitioner without the permission of the Plaintiff (the dependent's guardian) and without a court order.

43. Judge Munyon presided over the case from 2/16/23 to 5/26/23. On 3/28/23, the Judge held a case management hearing and limited discovery to May 31, 2023. The Plaintiff was not able to personally attend the hearing due to traffic and was caused to show up telephonically. The Court's equipment for telephonic hearing sounded so scrambled that she could hardly understand the proceedings. On May 1, 2023, Judge Munion denied the Plaintiff's emergency motion requesting medical expenses to help care for the dependent. This was based largely on Peter Haeberli's manufactured and false financial affidavit. Without any relief to help provided care for her medically fragile son, who requires two people at all times to manage his care, the Court was crippling the Plaintiffs ability to either attend to court matters, meet deadlines, litigate against Peter Haeberli's bevy of attorneys at the Lowndes Law Firm, let alone prepare for or attend a trial.

44. During the May 1, 2023 Emergency Hearing, Plaintiff was represented by Mr Pedata during the hearing 5/1/23. Mr Pedata only presented one financial affidavit from 2/13/23 showing that Peter Haeberli had little income. He did not provide prior affidavits showing dissipation of

$6,724,002 from one of his accounts. He did not provide to opposing counsel with the exhibit showing that the dependent needed to caregivers at all times, one of which had to be a nurse. He would not appeal the order. Mr Pedata was not keeping Plaintiff informed of any filings in the case or scheduled depositions. He was paid $10,000 retainer, he never produced a bill, nothing he did benefited the Plaintiff and she was worse off for his involvement. Mr Pedata did not pursue any discovery or issue any subpoenas. He was fired on 6/13/2023.

45. Peter Haeberli and his legal representation attorneys Terry Young, Derren Ciaglia and Melody Lynch had filed financial affidavits with the court that were false, deceiving the court. They produced incomplete mandatory disclosure for their client and filed notices of compliance. During the May 1, 2023 hearing, they admitted into evidence a false financial affidavit deceiving the Court. Terry Young deceived the court stating that the divorce in New Jersey between Peter Haeberli and Marion Fricker was equitable. The attorneys subpoenaed the dependents nursing agency Family First to produce documentation for the hearing on May 1, 2023 without notice to the court or the Plaintiff. Well prior on 3/27/2023, the Plaintiff objected to a similar notice of subpoena of Family First and a hearing had been scheduled for the objection on 6/26/23. They had no

authority from the Court to re-issue the subpoena that had been objected to and the Plaintiff was not informed about the subpoena. The Attorneys from the Lowndes Law Firm tried to conceal their acquisition of unlawfully subpoenaed documentation by not informing either the court or the Plaintiff of the subpoena.

46. The Plaintiff was denied access to meaningful hearings and due process when Judge Gibson presided over the case from 5/26/23 to 11/7/23 as follows: a) On 6/26/23, the Judge was informed that Peter Haeberli's attorneys had subpoenaed the Nursing Agency (Family First) even though she objected and they failed to inform her of the document production. The Judge said that they were from a high-end law firm and they knew what they were doing clearly showing prejudice against the Plaintiff, a pro se litigant; b) The Plaintiff said that Peter Haeberli and his attorneys were causing problems for the her and her son by subpoenaing all the dependent's medical practitioners for all his medical information from a family court because it looked as if there was an issue with his care which the Plaintiff was solely responsible for as a legal guardian; c) Plaintiff had complied with administrative order 2014-19 only to be denied access to the court; c) after numerous attempts to get hear times for her motions, the Judge would only adjudicate motions from chambers without any

evidentiary hearing. She disposed of motions without allowing Plaintiff access to the court and without production of evidence.  For example, on 10/16/23, the Judge denied, from chambers, a Motion for Joinder, requesting long arm jurisdiction of Marion Fricker due to an extensive pattern of taking possession of Peter Haeberli's assets to hide them from the court; d)  On 10/16/23, Judge Gibson did grant an additional two months to get discovery, yet opposing counsel objected and there was no way to get a hearing on the objection timely or otherwise, effectively denying access to discovery; e) After scheduling an in person case management hearing for 11/14/23, the Judge noticed a short 15 minute status hearing for 11/3/2023  by filing a notice which had conflicting requirements and during the hearing she chose to hear a contested motion that was not noticed for hearing, she also offered the Plaintiff the option for a hearing time and she also offered to recuse herself; f) after the Plaintiff accepted the hearing time on January 22,2024 for three hours, the opposing counsel filed a motion for recusal; and g) this denied the plaintiff access to an in person three hour evidentiary hearing and the 30 minute in person Case management hearing and therefore denied her any meaningful access to the court.   During the period that Judge Gibson presided over the case, she scheduled one motion for my counsel to

withdraw and in person hearing for discovery requested by Peter
Haeberli.  Attorneys from the Lowndes Law Firm were able to access the
court for discovery when the Plaintiff was denied such access.

47. Opposing counsel interfered with any attempt to get subpoenaed
discovery.  They objected to the subpoenas knowing there was no way for
Plaintiff to get access to the court for ruling on the objection.  They emailed
the companies to tell them that the clerk's seal was not real, when it was.
They had communications with the companies.  They appeared to have
subpoenaed Moderna, Peter Haeberli's "past employer" without any
notice of intent to the Plaintiff or the Court. They refused to comply with
my subpoenas and I was unable to get discovery.  Flagship Pioneering was
also subpoenaed and they would not respond, instead sending the
Flagship Pioneering subpoena to another company Moderna, who would
not produce any information either. A networking website, ZoomInfo,
showed that Peter Haeberli had been employed with Flagship Pioneering
as well as Moderna, yet Plaintiff was not able to get any documentation
through subpoena.

48. In order to circumvent the failure to get a hearing for access to discovery,
Plaintiff wrote Motions for Court Rulings and emailed curtesy copies to
the JA requesting an order.  The opposing counsel immediately emailed

36

their objection to any ruling on discovery without a hearing. The Plaintiff
was then without a ruling or hearing for discovery.

49. Plaintiff filed on 11/24/2023 an emergency motion that requested the
Court schedule a hearing within 30 days for four hours, relief to provide
for necessary medical care her dependent son, safe transportation, access
to the community, repairs for a safe home environment and, among other
things, to provide support until trial to help with trial preparation and
preparation of an accurate financial affidavit not base largely on estimates.
The emergency went without response from the subsequent Judge
McCarthy.

50. The Plaintiff was denied access to meaningful hearings and due process
when Judge McCarthy presided over the case from 11/7/2023 to 6/6/2024
as follows: Despite numerous attempts to have hearings held on change of
venue and emergency motions, the Plaintiff was denied access to the court.
The Plaintiff, in a desperate move to get in front of the court for her
emergency, sent the Judge, the opposing counsel and the Florida governor
a video of the dependent injuring himself due to lack of care. Yet, the
Judge only privileged Peter Haeberli and his attorneys when the court
scheduled their motion for a case management hearing that occurred on
5/13/2024. Peter Haeberli was allowed to show up virtually even though

the Plaintiff had previously objected, and this hearing required personal appearance pursuant to court procedures.  During the hearing, which was non-evidentiary, the Judge called up Plaintiff's emergency motion without notice.  He claimed that there was both intrinsic and extrinsic fraud.  He said he did not know what to do and that we were going through all the Judges.  He acknowledged the harm to the dependent.  The Plaintiff asked only that she have evidentiary hearing on all her motions, Yet the Judge scheduled the case for trial without any scheduling of evidentiary hearings and denied the Plaintiff's emergency motion (evidenced only in court notes) without actually filing a proper notice of hearing, without physical appearance of the litigants during a proper evidentiary hearing and without any evidence.  A Motion for Disqualification was filed on 5/20/24 and then granted on 6/6/24.  During the 7 months under Judge McCarthy, he only scheduled one 30-minute non-evidentiary case management hearing.

51. Opposing counsel were impeding any attempt to gain access to the Court. For example, Plaintiff started on 3/28/24 to coordinate a hearing time with opposing counsel.  The first coordinate time slot on 4/25/24 was unavailable when requested.  Then we coordinate the time for hearing on 4/29/24.  After that agreement Plaintiff amended the motion to change

venue to make it legally sufficient.  All requirements for administrative

rule 2014-19 were met with two separate meet and confers.  The Plaintiff

emailed the JA to request notice of hearing with the legally sufficient

motion.  Terry Young, replied that they "have never agreed to have a

hearing on these or the other myriad of motions filed by the

FW[Plaintiff]….our position is that these motions do not require actual

virtual or in person hearings, but should be ruled upon on the papers

themselves…This does not deny any party access to the courts but rather is

within the Court's inherent discretion to efficiently and effectively control

its docket providing all litigants with reasonable and timely access to

prompt judicial relief but is the interest of the judicial economy." (7/17/24

email)

52. Judge McCarthy's Judicial Assistant was being told by Attorney Terry

Young not to schedule Plaintiff's motions for hearing.  On April 9th, 2024

he wrote to the JA,

> "Most, if not all of these motions, have already been ruled on by predecessor
> judges, or have been responded to in detail, requiring no actual hearing
> time as they can be ruled on based on the papers.  Alternatively, far less
> hearing time is needed than the Former Wife requests.
>
> A review of this voluminous file by the Court will reveal repetitive,
> numerous and unnecessarily lengthy filing by the Former Wife herself as a
> pro se litigant and by her multiple previous counsel. An objective review of
> these filing will reveal the Former Wife's stated distain for the judiciary, the

> *Former Husband, his counsel and even the Former Wife's previous counsel, as well as the conclusion that these filing lack factual or legal merit.*
>
> *As a result, the requested hearing time by the Former Wife should be deferred until a CMC is held"*

The result was that the Former Wife was prejudiced by the CMC hearing in that the Judge would not schedule any hearings and wanted the case to go to trial. The court was taking direction from opposing counsel.

On March 27, 2024, the Judicial Assistant, Ms Rylee Burkovsky told the opposing counsel to file another motion to appear virtually and instructed Plaintiff not to file an objection since they had already had one filed to the prior Motion for telephonic appearance. The Plaintiff then relied on the prior objection filed on March 1, 2024 as evidenced in the JA's email:

> *"…And, yes, please file a separate Motion requesting to appear virtually, along with a proposed Order for consideration. We are already in receipt of Respondent's filed Objection as well that was filed to the case on 03/01."*

The Plaintiff complied with the Judicial Assistant and relied on her prior objection, yet the Judge allowed Peter Haeberli to show up telephonically to the CMC and against his own court procedures. This show conspiracy and an interplay between the court and the opposing counsel.

On April 12, 2024, Plaintiff requested hearing times on her motions on May 16 and May 20th, 2024, after conferring with opposing counsel and complying with Administrative rules, only to be told by the JA that,

> *"Ms. Ayla, there are other cases set for 05/13 and, therefore, no matter can be heard for the entire day on Monday. A discussion can be had at a Case Management Conference regarding what pending matters can be set for hearing(s)."*

Her response did not address the requested date and time. There was no way to get access to a proper hearing on the Plaintiff's motions.

On April 22, 2024, the JA additionally made other requirements to access the Court in addition to the hurdle of going through Administrative Rule 2014-19 to find one date but now it required three dates that had to be agreed upon, she wrote:

> *"Whenever a hearing request is for more than one-hour, I must discuss the request with the Judge. Ms. Ayla, unfortunately, the time block can no longer accommodate 90 minutes, and for that I apologize. I would always recommend finding multiple, agreeable dates for any Motion to be heard on – 3 is usually best - due to the frequent hearing requests we receive, along with other cases being rescheduled, cancelled, or set in open Court. I always try to be transparent when such an occurrence happens. I would not wish for anyone to believe their requests are being infringed upon."*

53. During the case management hearing Peter Haeberli showed up virtually and his attorneys (Mr Young, Ms Ciaglia) showed up in person. During the hearing they deceived the Judge by stating that the Plaintiff's motions all had one confer date and that she had not complied with the administrative order 2014-19 prior to that date. This was not true, the plaintiff had complied with the administrative order and went above and

beyond to meet and confer more than one time in order that her motions could get heard.  Additionally, they were claiming that they had not interfered with discovery which was also false.

54. The Plaintiff was denied access to meaningful hearings and due process with the current Judge Nix Walker who was assigned to this case on 6/6/24.  The Plaintiff filed on 6/28/24 an EMERGENCY MTION FOR IMMEDIATYE RELIEF, MOTION FOR RECONSIDERATION OF CASE MANAGEMENT RULING (COURT MINUTES 5/13/24), and MOTION FOR LEGAL, NOTICED AND PROPER EVIDENTIARY HEARINGS ON FROMER WIFE'S EMERGENCY MOTION FOR CONTEMPT FILED 11/24/23, and MOTION FOR PROPER CASE MANAGEMENT CONFERENCE HEARING, and MOTION TO DENY TELEPHONIC/VIRTUAL APPEARANCES, and MOTION TO DISPOSE OF ADMINISTRATIVE RULE 2014-19 AS UN LAWFUL AND NOTICE OF UNAVIALIBILITY AND FORMER WIFES RESPONSE IN OPPOSITION TO: PETITIONER'S MOTION TO SCHEDULE PRETRIAL CONFERENCE AND REQUEST FOR PETITIONER TO APPEAR TELEPHONICALLY OR VIA A VIRTUAL COMMUNICATION PLATFORM DIRECTED BY THE COURT FILED 6/18/16.  The Judge denied the emergency motion as an emergency, which effectively denied

relief for medical care for the dependent.  The Judge referred it for hearing and claimed a hearing would be set with the circuit judge per order on 7/2/24.  After numerous attempts to get her emergency motion heard by requesting a 4 hour hearing without response from the court (on 7/11/24, 7/15/24, 7/17/24), the Plaintiff noticed the court for a four hour hearing filed 7/22/24 and she also MOTION FOR JUDGE TO SET HEARING ON EMERGENCY MOTION.  On August 19. 2024, Judge Nix Walker scheduled a 1.5 hour hearing on all of the Plaintiffs motions to occur on September 16,2024. On 8/27/24, Peter Haeberli wrote a motion to attend virtually and the Judge granted virtual appearance for both Peter Haeberli and his attorneys in opposition to the Plaintiff's objection filed on 8/29/24. Due to this prejudice and continued failure to hold in person evidentiary hearings, the Plaintiff withdrew her notice of hearing and wrote Motions to disqualify that were denied for being legally insufficient.  The Plaintiff was/is being barred from access to the court, evidentiary hearing and due process.  Since June 6, 2024 and in front of Judge Nix Walker, the only hearing that the Judge herself scheduled was on Plaintiff's motion for extension of time.  After a request from Peter Haeberli's counsel for a pretrial order on January 10, 2025, Plaintiff filed a Motion to Stay due to Middle District Court Case No: 6:24-cv-01987 and this pending filed case.

43

Judge Nix-Walker issued an order on January 15, 2025 that required the Plaintiff to have retroactively complied with deadlines that required document production and trial evidence lists to have been filed on or prior to January 8, 2025. This Pretrial Order further prejudices the Plaintiff by making it impossible for her to comply with the court order.

55. During the time that Judge Nix Walker has presided over the case, Peter Haeberli and his attorneys (Ms Ciaglia, Mr Young and Ms Lynch) have prevented access to the court by claiming that the court should not make unilateral decisions regarding scheduling hearings. They claim that emergency hearings cannot get scheduled without adherence to administrative rule 2014-19. They claim that Plaintiff was not complying with the court's procedures for scheduling, yet she was and there was no way for her to access proper evidentiary hearings timely or otherwise. They have claimed that there is res judicata so that a change of venue motion could not get scheduled even though there was never a proper hearing on the change of venue and it had last been denied for being legally insufficient without prejudice. They have special privilege not to show up for evidentiary hearings when Plaintiff objected. The attorneys also wrote notices of unavailability that also prevented the Plaintiff from accessing the court for large chunks of time. Most recently on January 10,

2025, Plaintiff filed a letter regarding attempted exparte communication and mail a copy to opposing counsel in which she objected to the following statement emailed to the JA:

*"Please find attached a courtesy copy of the Former Husband's Objection and Response to Former Wife's Amended Motion to Abate Proceedings filed with the Court. Should you have any questions or concerns, please do not hesitate to contact the office."*

56. Since Judge Munion's order denying further discovery past May 31, 2023 and over the past 19 months, the Plaintiff was only allowed by a court order, two months to pursue discovery. Prior to those two months and the May 31st deadline, the Plaintiff's counsel would not subpoena any documents for discovery. Opposing counsel obstructed access to subpoenaed companies and objected to subpoenas that fell outside of the two-month period. They would not respond to a ninth request to produce filed 9/10/2023 to which they objected to. Peter Haeberli through his counsel from the Lowndes Law Firm substantially objected to the majority of the Plaintiff's request for document production from 2021 through the present and there was no way to compel discovery. They interfered with the scheduling of any motion seeking discovery thereby foreclosing any access to a meaningful trial.

57. In furtherance of the conspiracy to deny Plaintiff access to judicial remedies, Defendant Peter Haeberli and Marion Fricker engaged in a coordinated scheme to remove assets from the reach of the Florida courts as follows: a. the defendant Peter Haeberli concealed approximately $18 million in income from the Florida court while claiming inability to pay support; b. The defendants orchestrated a sham divorce proceeding in New Jersey for the purpose of transferring assets to Marion Fricker; c. The defendant Peter Haeberli deliberately terminated his employment in a manner causing the disabled dependent to lose essential medical insurance coverage; d. These actions were taken with the specific intent to prevent Plaintiff from obtaining relief in the Florida courts and to retaliate against Plaintiff for seeking judicial enforcement of support obligations.

58. The coordinated nature of the conspiracy is evidenced by the following sequence of events: a. In 2021, the Florida court, under Judge Mize, denied Peter Haeberli's motion for summary judgment on 8/2/21, explicitly finding that his assets could be used to pay increased support despite claims of disability; b. During a subsequent case management hearing on 1/24/22, Judge Mize, despite knowing of Peter Haeberli's substantial assets and the prior ruling, suggested that a divorce from his second wife could justify decreased support; c. On November 22,2022, prior to the

divorce but largely after the orchestrated asset transfer through the New Jersey marital settlement agreement, Peter Haeberli filed a counter-petition in Florida seeking to reduce both alimony and child support; d. In December 2022, Peter Haeberli then proceeded to execute a divorce agreement in New Jersey transferring the bulk of his assets to Marion Fricker and their three children while accepting the majority of debts; e. This sequence demonstrates the state court's active participation in facilitating the scheme to shield assets and deny Plaintiff meaningful access to relief.

59. Since 2011, Defendant Peter Haeberli has systematically filed false financial affidavits in the state court proceedings, including: a. Concealing his true income during the 2018 trial before Judge Tennis, resulting in artificially reduced support obligations; b. Failing to disclose approximately $18 million in income during the pendency of the state court proceedings; c. Submitting false claims of disability and unemployment while maintaining substantial assets and income; d. Using the fraudulently reduced 2018 support ordered in the Supplemental Financial affidavit as a baseline for his current attempt to further reduce support.

60. The defendants including the Judges, Peter Haeberli and the attorneys are aware of injuries to the dependent yet continue to deny access to hearings that would have provided the dependent with necessary care. The Plaintiff's Final Judgment has been unenforceable since 2011. Peter Haeberli, the dependent's father has willfully intended harm to his son by not complying with the terms of the Marital Settlement Agreement and Final Judgment. He has denied his son access to his medical benefits and has additionally denied him access to non-Medicaid insurance. Peter Haeberli has been provided images of injury that his son has endured due to an inability to enforce the Final Judgment in any legitimate way.

61. The state court's systematic denial of evidentiary hearings has prevented Plaintiff from presenting evidence of this ongoing fraud, even though Florida Family Law Rule 12.540 would permit correction of the fraudulently obtained orders with no time limitation.

62. As a direct result of Defendants' conduct: a. Plaintiff's disabled son has been denied necessary medical care; b. Plaintiff was forced to sell her home to pay for care costs; c. Property damage has occurred due to lack of proper care assistance, including but not limited to a house flood; d. Plaintiff and her son have been effectively imprisoned in their home due to lack of care support, e. the dependent engaged in increased self-injurious

behaviors, f. Plaintiff has been forced to endure a lowered standard of living, and g. Plaintiff has suffered emotionally being forced to litigate against an unjust legal system, highly skilled attorneys, threatened to have her son removed from her care, denied her own access to medical care, needing medical care, having difficulty sleeping, and having no legal remedy or end in sight.

63. The denial of access to the lower tribunal extended to the appellate level when Plaintiff sought an Appeal of a Motion for Joinder (case no. 6D2023-3921).  The brief specifically requested that the lower tribunal timely hold a four-hour evidentiary hearing on Plaintiff's motion.  The District Court of Appeals denied the appeal without written opinion.  A motion for written opinion was denied preventing plaintiff from further review from the supreme court.

64. The systematic denial of access extended to the appellate level when Plaintiff sought emergency relief through a petition for an emergency writ of mandamus (case no 6D2024-0522). The petition specifically requested: a. An order compelling the lower tribunal to hold proper evidentiary hearings;  b. Transfer of the case to an unbiased court jurisdiction;  c. Relief from the ongoing denial of access to meaningful hearings.  The plaintiff

motioned for rehearing and written opinion that was also denied

foreclosing any further action.

65. The appellate court's denial of this emergency petition further

demonstrates:  a. The complete foreclosure of meaningful judicial remedies

at all levels of the state court system; b. The state courts' unwillingness to

enforce basic due process requirements;  c. The coordinated nature of the

denial of access across multiple levels of the state judiciary;  d. The

unavailability of adequate state court remedies to address the ongoing

constitutional violations.

66. The Plaintiff also sought relief from the Florida Supreme Court (case no.

sc2020-0526) regarding district court case no. 5D19-2810 and 5D19-2334

with a Petition for writ of Mandamus, Prohibition or Constitutional Writ.

The petition stated that the Plaintiff was being denied her day in court

without any judicial relief.  The lower tribunal (case no 2006-DR-

19002)denied a motion for change of venue from chambers and a motion

for relief from judgment was again denied from chambers without

prejudice for a failure to state any factual allegations or legal basis for the

Court to reopen the Final Judgment from July 19, 2018 based on Florida

Rule of Procedure 1.540.  These were adjudicated without the benefit of

testimony or production of evidence. On 4/15/20, the supreme court

dismissed the petition for lack of jurisdiction.

67. The denial of access extended through multiple levels of the state court

system, including the appellate court's refusal to grant mandamus relief

and an appeal of the Motion for Joinder. Both requesting access to

evidentiary hearings, and the Florida Supreme Court refusal to accept

Jurisdiction in matters regarding right of access to the court for redress for

injury demonstrating the complete foreclosure of meaningful state court

remedies and the necessity of federal court intervention to protect

constitutional rights.

68. The conduct of the Judicial Defendants extends beyond protected judicial

functions through a coordinated pattern of administrative acts, actions

exceeding judicial authority, and conduct undertaken in clear absence of

jurisdiction. The Judicial Defendants systematically implemented

discriminatory scheduling policies that categorically prevented emergency

medical hearings, while establishing and enforcing Administrative Rule

2014-19 as an insurmountable barrier to meaningful court access. These

defendants further exceeded their judicial authority through ex parte

coordination with private attorneys to obstruct discovery, direct

interference with subpoena compliance outside of any pending motions,

51

and implementation of retaliatory procedures targeting pro se litigants without any case-specific justification. The Judicial Defendants additionally acted in clear absence of jurisdiction by ruling on matters not properly noticed for hearing, and implementing policies that directly violate state procedural rules governing court access.

69. This action presents independent federal constitutional violations distinct from any state court judgments or orders. The systematic denial of meaningful access to courts manifested through the categorical refusal to schedule emergency hearings, implementation of discriminatory administrative barriers, and coordinated obstruction of discovery. These violations exist independently of any state court rulings and do not seek review of state court judgments. The conspiracy to deny federal rights, evidenced through coordinated action between state and private actors, systematic discrimination against disabled dependents, and implementation of policies designed to prevent meaningful hearings, constitutes a separate federal cause of action. Moreover, the denial of federal due process through the systematic refusal to hold evidentiary hearings, demonstrated bias against pro se litigants, and coordinated obstruction of judicial remedies represents distinct constitutional violations that do not implicate the Rooker-Feldman doctrine.

70. The private attorney defendants acted under color of state law through sustained joint participation with state judicial officers, willful engagement in state action, and conspiracy with state actors to deny constitutional rights. These defendants directly coordinated with judicial officers to prevent emergency hearings, implemented discriminatory scheduling practices in concert with court staff, and actively participated in the systematic denial of discovery with judicial approval. Their willful participation in state action included filing knowingly false affidavits while coordinating with state officers, deliberately obstructing subpoenas while working with court officials, and participating in the systematic denial of hearings through state procedures. The conspiracy with state actors manifested through regular ex parte communications with judicial officers, coordinated efforts to prevent discovery of assets, and joint implementation of discriminatory practices, all sharing the common objective of denying meaningful court access.

71. The conspiracy among defendants is evidenced by specific coordinated actions documented through a pattern of asset transfers and procedural maneuvers designed to shield resources from the Florida courts' jurisdiction. Between 2021 and December 2022, Defendant Peter Haeberli and Defendant Marion Fricker orchestrated a series of asset transfers

through their New Jersey divorce proceeding, effectively removing

approximately $6.7 million from the reach of Florida court orders

regarding medical support obligations. This transfer occurred shortly after

the Florida court had denied Peter Haeberli's motion for summary

judgment specifically finding his assets could be used for increased

support. The timing and structure of these transfers demonstrate a

coordinated effort to circumvent Florida court jurisdiction over assets

properly subject to medical support obligations. The Lowndes Defendants

subsequently facilitated the concealment of these transfers by filing

incomplete mandatory disclosures, submitting financial affidavits that

omitted the transferred assets, and making representations to the Florida

court characterizing the New Jersey divorce as an equitable distribution

while knowing of the underlying purpose to shield assets from medical

support obligations.

72. The Court should award comprehensive damages sufficient to provide for

all future medical care, living expenses, and support needs without

requiring ongoing court supervision or enforcement. These damages

should include: (a) A lump sum payment of $6,057,000 representing 30

years of support necessary to establish and maintain an appropriate

standard of living, with provisions for automatic cost-of-living

adjustments; (b) Funding for the dependent's lifetime care needs including basic annual care of $1,218,252 (comprising $876,000 for essential nursing/attendant care and $342,252 for routine daily medications), plus all additional medical care, therapies, equipment, and medications the amount to be determined at trial; (c) Creation and funding of a $2.5 million dependent care account to ensure consistent access to all support obligations; (d) Housing damages of $850,000 to secure and modify an appropriate residence meeting the dependent's specialized needs; (e) Transportation damages of $85,000 for acquisition and maintenance of handicap-accessible transportation; (f) $50,000 for acquisition and training of a specialized seizure alert service dog; and (g) Emotional distress damages of $14 million ($1 million per year for 14 years) arising from Defendants' coordinated misconduct. These comprehensive damages are necessary because: (1) Previous support orders have proven unenforceable due to Defendants' systematic misconduct; (2) The dependent's extensive care needs require reliable, uninterrupted access to support funding; (3) Traditional enforcement mechanisms have been rendered ineffective through systematic denial of court access; and (4) A comprehensive damages award would eliminate the need for future court intervention

that has proven futile due to Defendants' conspiracy to prevent

meaningful hearings

CLAIMS FOR RELIEF

COUNT I - 42 U.S.C. § 1983 - Denial of Due Process (Against All Defendants)

The systematic denial of due process occurred through the coordinated actions of

all defendants as detailed in paragraphs 21-72. The State of Florida established

and maintained discriminatory administrative systems that effectively barred

meaningful hearings. The judicial defendants implemented these systems

through systematic denial of emergency motions and evidentiary hearings. The

attorney defendants exploited and reinforced these barriers through coordinated

obstruction of discovery and manipulation of court procedures. Peter Haeberli

and Marion Fricker utilized these systemic failures to conceal assets and evade

court oversight, while participating in the broader scheme to deny constitutional

protections.

The defendants' interrelated conduct created a comprehensive system that

denied basic due process rights through the systematic denial of emergency

medical motions without hearings, coordinated prevention of meaningful

evidentiary proceedings, and implementation of Administrative Rule 2014-19 as

a barrier to court access. Their orchestrated obstruction of discovery and

enforcement proceedings, combined with deliberate concealment of financial resources and evidence, and creation and exploitation of discriminatory scheduling practices, deprived Plaintiff of constitutionally required notice and opportunity to be heard regarding critical medical care needs and support obligations.

COUNT II - 42 U.S.C. § 1983 - Denial of Access to Courts (Against All Defendants)

The defendants' integrated conduct systematically denied meaningful access to judicial remedies as detailed in paragraphs 21-72. Through coordinated action, the defendants created and maintained barriers that effectively foreclosed Plaintiff's ability to present evidence, obtain hearings, or secure enforcement of court orders. The State provided the framework through discriminatory administrative rules, while the judicial defendants implemented systematic barriers to emergency hearings. The attorney defendants manipulated these procedures while coordinating with state actors to prevent discovery, and the individual defendants exploited this system to conceal assets and evade court oversight.

This coordinated conduct denied access to courts through implementation of insurmountable administrative barriers and systematic denial of emergency

medical hearings. The defendants' orchestrated obstruction of discovery and evidence, combined with their deliberate concealment of financial resources and creation of discriminatory scheduling practices, prevented meaningful enforcement proceedings. Their integrated actions effectively barred Plaintiff from obtaining judicial relief for critical medical needs while facilitating the fraudulent concealment of assets needed for dependent care.

COUNT III - 42 U.S.C. § 1985(2) - Conspiracy to Obstruct Justice (Against All Defendants)

The defendants engaged in a coordinated conspiracy to obstruct justice through systematic denial of judicial remedies as detailed in paragraphs 21-72. Their integrated conduct demonstrates a shared purpose of preventing meaningful court access and concealing evidence. The State's administrative framework facilitated systematic denial of hearings, while judicial defendants implemented discriminatory practices. Attorney defendants coordinated to prevent discovery while individual defendants executed fraudulent transfers.

This conspiracy manifested through systematic filing of false financial affidavits and coordinated obstruction of discovery and evidence. The defendants orchestrated transfers of assets to evade court jurisdiction while implementing discriminatory scheduling practices that prevented meaningful enforcement

proceedings. Their deliberate concealment of financial resources and coordinated prevention of emergency hearings demonstrated a persistent pattern of conduct designed to obstruct justice and deny judicial remedies.

COUNT IV - 42 U.S.C. § 1985(3) - Conspiracy to Interfere with Civil Rights (Against All Defendants)

The defendants conspired to deny equal protection and due process rights through their coordinated conduct as detailed in paragraphs 21-72. Their integrated actions created a system that discriminated against Plaintiff and her disabled dependent son by preventing access to critical medical care funding and support. The State's policies enabled systematic discrimination, while judicial defendants implemented barriers to relief. Attorney defendants facilitated denial of access while individual defendants exploited these systemic failures.

This conspiracy resulted in the denial of access to emergency medical care hearings and prevention of support obligation enforcement. The defendants' coordinated obstruction of financial resource discovery, implementation of discriminatory practices, and systematic bias against pro se litigants demonstrated deliberate indifference to medical needs. The conspiracy specifically targeted Plaintiff and her disabled dependent son through

coordinated action that prevented access to critical care resources while concealing millions in available assets.

This coordinated misconduct resulted in severe harm through denial of necessary medical care and forced sale of Plaintiff's home. The property damage from lack of care assistance and effective imprisonment in their home led to increased self-injurious behaviors by the dependent. The defendants' integrated scheme caused severe emotional distress to Plaintiff and dependent while creating ongoing deprivation of basic rights and protections.


PRAYER FOR RELIEF WHEREFORE, based on the foregoing counts and violations, Plaintiff requests that this Court:

A. ISSUE DECLARATORY RELIEF:

1. On Counts I and II (Due Process and Court Access): a. Declare that Administrative Rule 2014-19, as implemented, violates constitutional rights to court access; b. Declare that the systematic denial of emergency hearings violates due process; and c. Declare that the coordinated obstruction of discovery violates due process.

2. On Counts III and IV (Conspiracy): a. Declare that Defendants' coordinated conduct constitutes an unlawful conspiracy; b. Declare that the New Jersey

divorce proceeding was conducted to fraudulently transfer assets; and c. Declare that financial affidavits submitted from 2011 to present contained material misrepresentations.

B. AWARD COMPENSATORY DAMAGES: Plaintiff seeks these damages only to the extent they are not compensated through the parallel action [case no 6:24-cv-01987-WWB-RMN], and does not seek double recovery for any single injury. Any award should be coordinated with and offset against any recovery in the parallel action to prevent duplicate compensation.

1. Direct Financial Damages: a. Attorney and specialist fees: approximately $95,000; b. Caregiver and nursing costs no less than $50,000; c. Property damage: approximately $35,000; d. Medical equipment: approximately $10,000; e. Over due Tax and penalties of approximately $25,000; and f. Additional property damage: To be determined at trial

2. Future Care Damages:

a. Plaintiff requests that this Court order alimony a lump sum payment of alimony totaling $6,057,000, representing 30 years of support necessary to establish and maintain an appropriate standard of living. This relief is essential because: (1) Litigation attempting to obtain appropriate support has been ongoing since 2011 without meaningful resolution due to Defendants' systematic

denial of court access and coordinated obstruction of judicial remedies; (2) The 2018 Supplemental Final Judgment was based on fraudulent financial affidavits, resulting in artificially suppressed support calculations; (3) Plaintiff was forced to sell her home and accept a severely reduced standard of living due to Defendants' fraudulent conduct and conspiracy to deny court access; (4) The dependent's extensive care needs have prevented Plaintiff from maintaining employment or developing earning capacity while Defendants deliberately withheld support; (5) The stress and time demands of caring for a severely disabled dependent without adequate support, combined with the necessity of constant litigation to seek enforcement, have impaired Plaintiff's ability to maintain employment or advance professionally; (6) Defendants' conduct has caused Plaintiff to expend substantial resources on legal fees and care costs that should have been covered by support payments; (7) A long-term alimony award is necessary to prevent Defendants from continuing to use fraudulent financial affidavits and procedural obstruction to deny support; and (8) A comprehensive award would reduce the need for repeated court intervention that has proven futile due to Defendants' conspiracy to prevent meaningful hearings. The alimony award should include provisions for automatic cost-of-living adjustments to maintain consistent purchasing power regardless of economic conditions, and should not be subject to modification based on Defendant's

claimed changes in circumstances given the demonstrated pattern of fraudulent financial reporting.

b. Plaintiff requests that this Court order the State of Florida, along with Defendants Peter Haeberli, Marion Fricker, and the Lowndes Law Firm (all collectively responsible through their coordinated actions), to pay all required costs and expenses for the dependent's care to the extent such amounts are not recovered through the parallel action [MCO case no 6:24-cv-01987-WWB-RMN] in the Middle District Court of Florida. These costs include basic annual care of $1,218,252 (comprising $876,000 for essential nursing/attendant care and $342,252 for routine daily medications), plus all additional medical care, medical transportation, therapies (not limited to, speech, music, equine, applied behavioral analysis, occupational, physical), medical equipment, medically necessary consumables (wipes, gloves, pull ups, etc.), and medications. These cost amounts shall be adjusted based on the prevailing rates for comparable services in whatever geographic location within the United States where Plaintiff and dependent reside, as care costs in many other states substantially exceed Florida rates. The award should include provisions ensuring that relocation that may be required to obtain better care or resources does not reduce the quality or quantity of care due to geographic cost differences.  The State bears particular

responsibility because: (1) The Final Judgment was intended to ensure all medical and care needs were met; (2) The State's systematic denial of meaningful court access prevented enforcement of these support obligations; (3) The State's implementation of discriminatory policies directly impaired the dependent's right to support and medical care; and (4) The State's deliberate indifference while facilitating fraudulent asset concealment constitutes discrimination under Title II of the ADA. The payment structure should include provisions for lifetime care, automatic adjustments, independent oversight, and emergency funds. These damages from the State and other Defendants are necessary to fulfill the support obligations that were rendered unenforceable through their coordinated misconduct

c. Plaintiff requests the Court order the creation and funding of a $2.5 million dependent care account to ensure consistent access to all dependent support and care obligations, including but not limited to child support. This structured relief is essential because:

(1) The State of Florida, through its systematic denial of meaningful court access and violation of Title II of the ADA, shares responsibility with Peter Haeberli for ensuring ongoing dependent support because: i. The State's deliberate

indifference and discriminatory practices rendered the original support obligations unenforceable; ii. The State's coordinated conduct with other defendants prevented discovery and enforcement of support obligations; iii. The State's violations of Title II of the ADA directly impaired the dependent's rights to support and care; iv.  And, The State's systematic denial of court access effectively prevented enforcement of basic support obligations

(2) Joint liability between the State and Peter Haeberli for maintaining this account is appropriate because: i. The State's constitutional violations directly facilitated Peter Haeberli's evasion of support obligations; ii.  The State's discriminatory practices enabled the fraudulent concealment of assets; iii.  The dependent's rights to support were impaired through the combined misconduct of both parties; and iv. Requiring joint responsibility ensures consistent funding regardless of future asset concealment attempts

(3) The structured account should include: i.  Initial funding of $2.5 million (adjusted for inflation from date of filing); ii. Mandatory replenishment requirements when balance falls below specified threshold; iii.  Independent trustee oversight of all expenditures; iv.  Annual cost-of-living adjustments to maintain purchasing power; v.  Clear guidelines for authorized support-related expenditures; vi. Provisions for emergency access to funds; and vii.  Joint and

several liability between the State and Peter Haeberli for maintaining required funding levels

(4) This relief structure is necessary because: i. Previous support orders have proven unenforceable due to defendants' coordinated misconduct; ii.  The dependent's needs require reliable, uninterrupted access to support funding; iii. Traditional enforcement mechanisms have been rendered ineffective through systematic denial of court access; iv. Joint state liability ensures consistent support even if private assets are concealed or dissipated; v.  Independent oversight prevents future fraudulent evasion of obligations; vi. The account structure reduces need for repeated enforcement actions; and vii. Comprehensive funding provisions protect against economic changes,  inflation and relocation.


d. Plaintiff requests that this Court order damages sufficient to secure appropriate housing, including: (1) Compensation for the loss of Plaintiff's mortgage-free Winter Park home, which she was forced to sell in 2016 due to mounting debt from dependent care costs and Defendants' fraudulent denial of support, while Defendant Peter Haeberli simultaneously purchased a million-dollar residence using concealed assets; (2) The cost of acquiring and modifying a

suitable residence that meets the dependent's specialized needs, estimated at a minimum of $700,000 based on current rental home in DeLand; (3) Additional funds of approximately $150,000 for necessary modifications and repairs to also accommodate the dependent's needs, including but not limited to a full-home generator installation, specialized safety features, reinforced walls and doors, water damage remediation, and other adaptive modifications; (4) This relief is essential because: (a) Plaintiff was forced from an established, higher socioeconomic community in Winter Park to a rental property in a more remote area of DeLand, representing a significant reduction in standard of living; (b) The current rental property has sustained substantial damage due to the dependent's condition and requires extensive repairs that cannot be completed without stable housing alternatives; (c) The dependent's care needs require specific housing features and modifications that are not available in rental properties; (d) Florida's relatively low cost of living means that equivalent housing in other states and other areas of Florida would require significantly greater funding; and (e) Defendants' fraudulent conduct has prevented Plaintiff from maintaining stable, appropriate housing while allowing Defendant to acquire luxury real estate through concealed assets. The housing award should include provisions for market adjustments to ensure the ability to secure appropriate housing in any

U.S. jurisdiction, recognizing that relocation may be necessary to ensure adequate care resources for the dependent.

d. Plaintiff requests that this Court order damages sufficient to acquire and maintain appropriate handicap-accessible transportation, including: (1) Replacement of the 2014 specialized vehicle that sustained over $17,000 in interior damage due to Defendants' conspiracy to deny adequate nursing care and support; (2) Funding of approximately $85,000 for a new handicap-accessible vehicle properly equipped to meet the dependent's specialized needs; (3) This transportation relief is essential because: (a) The current vehicle is non-operational and unsuitable for the dependent's needs due to extensive damage caused by insufficient care staffing; (b) Safe transportation requires specific modifications including wheelchair accessibility, specialized restraint systems, and reinforced interior components; (c) The dependent requires reliable transportation for medical appointments, therapies, and community access that cannot be provided through standard vehicles; (d) The lack of appropriate transportation, combined with inadequate care staffing, has further isolated the dependent and restricted access to necessary medical care and community services; and (e) Defendants' fraudulent conduct and conspiracy to deny support has prevented maintenance and replacement of essential specialized transportation while concealing assets that could have funded these needs. The

68

vehicle award should include provisions for future replacement and maintenance to ensure continuous access to safe, appropriate transportation for the dependent's needs.

e.  Plaintiff requests that this Court order damages of $50,000 for the acquisition and training of a specialized seizure alert service dog, including: (1) The purchase of a dog specifically bred and selected for medical alert work; (2) Comprehensive training in seizure detection and response; (3) Handler training for caregivers; (4) Required equipment and supplies. This specialized service animal is essential because: (a) The dependent suffers from a catastrophic form of epilepsy (Dravet Syndrome) requiring constant monitoring for seizure activity; (b) A properly trained seizure alert dog can provide early warning of impending seizures, allowing for faster medical intervention and potentially preventing injury; (c) The service animal can assist in alerting caregivers during nocturnal seizures when visual monitoring may be reduced; (d) Early seizure detection through animal assistance could reduce the frequency and severity of injuries sustained during sudden seizure onset; (e) The service dog would provide an additional layer of safety during periods when staffing gaps have left the dependent without adequate human monitoring; and (f) Defendants' fraudulent conduct and conspiracy to deny support has prevented access to this potentially life-saving resource while concealing assets that could have funded this medical

necessity. The award should include provisions for ongoing veterinary care and periodic refresher training to maintain the service animal's effectiveness.

3. Plaintiff requests that this Court order damages of $14 million for severe and ongoing emotional distress ($1 million per year for 14 years) arising from Defendants' coordinated misconduct. These damages are justified because: (1) Plaintiff has endured constant anxiety and distress since 2011 due to Defendants' systematic denial of court access while watching her disabled dependent son go without necessary care; (2) Plaintiff has suffered severe emotional trauma from: (a) Being forced to sell her home and accept a drastically reduced standard of living; (b) Witnessing her son's physical injuries and self-injurious behaviors that could have been prevented with proper care; (c) Enduring threats from judicial officers to remove her son from her care and place him in institutionalization; (d) Being subjected to false allegations of neglect when forced to implement makeshift safety measures due to lack of proper care resources; (e) Experiencing complete isolation and inability to attend important family events including funerals, weddings, and family reunions; (f) Being unable to properly grieve her father's death or arrange his funeral due to care demands; (g) Living under constant fear that her son could suffer severe injury or death due to inadequate care staffing; (3) Plaintiff has been deprived of basic medical and mental health care for herself, including needed surgery and therapy, due to inability to leave

her son; (4) The orchestrated denial of court access has subjected Plaintiff to profound helplessness and despair while watching her son suffer; (5) Defendants' conduct has forced Plaintiff into an effective imprisonment in her home, unable to maintain normal social relationships or basic quality of life; and (6) The emotional damage has been compounded by Defendants' deliberate and malicious nature of conduct, including coordinated efforts to deprive a severely disabled dependent of necessary care while concealing millions in assets. The severe emotional distress continues and has caused lasting psychological trauma that may require extensive future treatment.

b. Additional emotional damages to be determined at trial

C. AWARD PUNITIVE DAMAGES SUFFICIENT TO PUNISH THE FRAUDULENT CONDUCT AND DETER FUTURE SIMILAR MISCONDUCT:

1. Against Defendant Peter Haeberli: a. In an amount sufficient to punish the systematic filing of false financial affidavits from 2011 to present; b. To deter the deliberate concealment of approximately $18 million in income from court jurisdiction; c. To address the willful deprivation of medical care resources from a disabled dependent adult; d. To prevent future fraudulent transfers designed to evade court-ordered support obligations;

2. Against Defendant Marion Fricker: a. In an amount sufficient to punish knowing participation in fraudulent asset transfers; b. To deter the acceptance and concealment of assets transferred to evade support obligations; c. To address participation in a scheme that deliberately deprived a disabled dependent of necessary medical care; d. To prevent future conspiracies to shield assets from court jurisdiction;

3. The Court should consider in determining punitive damages: a. The deliberate nature of defendants' fraudulent scheme; b. The ongoing harm caused to a disabled dependent adult; c. The need to deter others from similar fraudulent conduct in family court proceedings; d. The importance of maintaining the integrity of court-ordered support obligations; e. The particular vulnerability of disabled dependents to such misconduct;

D. AWARD COSTS AND FEES:

1. Attorney fees pursuant to 42 U.S.C. § 1988

2. Expert witness fees

3. Court costs

4. Litigation expenses

E. ADDITIONAL RELIEF:

1. Pre-judgment interest as permitted by law

2. Post-judgment interest

3. Such other relief as the Court deems just and proper

F. PLAINTIFF REQUESTS THE COURT REFER EVIDENCE OF DEFENDANTS'

POTENTIALLY CRIMINAL CONDUCT TO APPROPRIATE AUTHORITIES

FOR INVESTIGATION, INCLUDING:

1. Fraudulent transfer of assets to evade Florida court jurisdiction

2. Filing of false financial affidavits in Florida courts

3. Use of New Jersey court proceedings to knowingly evade Florida support

obligations

4. Conspiracy to conceal assets from Florida court jurisdiction

Respectfully submitted,

Ayla Haeberli, pro se
PO Box 336
Deleon Springs, FL 32130
Cell Phone: 407-417-4752
Email Address: aylahaeberli@yahoo.com